Harrison, J.,
delivered tbe opinion of tbe Court.
Tbe plaintiff in error was indicted in tbe Circuit Court of Sbelby County, for burglary and an attempt to commit a rape. At tbe January Term, 1868, tbe plaintiff in error was put upon his trial, entered a plea *320 of not guilty; and the jury returned a verdict that “the defendant was guilty as charged in the indictment;” and fixed his term of imprisonment in the penitentiary at five years.
A motion for a new trial and in arrest of judgment was overruled, and judgment of sentence was passed against him; and the plaintiff in error appealed to this Court.
The indictment charges that the plaintiff in error, “on the — day of August, 1866, in the night-time of the same day, feloniously and burglariously did break and enter the dwelling house of B. S. Wynne, with intent to commit felony, by attempting to commit a rape upon one Miss V. W. Crenshaw, in the dwelling house aforesaid — then and there being — then and there feloniously and burglariously attempted to commit a rape as aforesaid, against the peace and dignity.”
On the 3d of October, 1866, the defendant in the indictment was tried by a jury, who returned a verdict that the defendant was guilty of burglary, as charged in the indictment, and they affixed his term of confinement in the penitentiary at fifteen years. On the 6th of October, 1866, he was sentenced by the judgment of the Court. He moved for a new trial and in arrest of judgment, which was overruled; to “which he excepted, and tendered a bill of' exceptions, and appealed to the April Term, 1867, of this Court, when, for manifest errors appearing, the judgment was reversed and annulled, and the cause was remanded to the Circuit Court of Shelby, for a new trial. At the January Term, 1868, of the Circuit Court of Shelby, the defendant was again *321 arraigned, pleaded not guilty, and was tried by a jury, wbo returned a verdict that the defendant was “guilty as charged in the indictment,” and fixed his term in the penitentiary at five years. He moved for a new trial and in arrest of judgment, which was overruled, and he excepted; was sentenced by the judgment of the said Circuit Court of Shelby; from which judgment of the Court he again appealed to this Court.
The proof is substantially as follows: Miss Crenshaw lived at the house of Wynne, the prosecutor, in 1866, and knows the prisoner. There were two rooms at Wynne’s house — a passage between them. She slept in one of them, with a child eight or nine years old. There were two windows to the room, with blinds; they were closed and fastened on the inside; and the sash were down when she went to bed. She generally went to bed about 9 o’clock. She went to sleep, and between 9 and 12 o’clock, she was awakened by some one touching her on her thigh. She saw some one in the room. Knew it was a negro, but did not know who it was. She says that from the moment she was touched, she apprehended violence. Some “rags” she had seen the prisoner wear, were lying upon the floor after the person left, and saw on the floor checked rags — linen rags exactly such as she had seen the prisoner wear. When she went to sleep, the covering was over her — when she awoke it was off. There were a pair of coarse shoes and a common black hat found under the window on the outside. She had seen the prisoner wear just such a hat before, but could not say whether the shoes belonged to prisoner or not, as all the negroes wore shoes *322 much alike. It was a warm night, and she does not know how the covering came off. On cross-examination, she stated that persons came into the room as soon as she gave the alarm. She cannot state when she first saw the shoes and hat — whether before or after they were removed from the window. All the negroes wore rags. There was no mark about the shoes enabling her to distinguish them from those of the rest of the ne-groes. She never saw any of the rest of the negroes wear a similar hat. She only saw the prisoner as he was passing about the farm. There was no impression made upon her mind as to who the person was in her room.
Wynne, the prosecutor, had hired the negro for 1866. When the alarm was given, he called up all the negroes except two — the prisoner and one other — who came up afterwards; but fails to state why he did not call up the prisoner. The prisoner was brought to his house next morning between day-light and sun-up. He had on a slick cap, which he seldom wore, except on Sunday, and this was not on Sunday. The prisoner’s house was about thirty yards from prosecutor’s. The windows, he states, had blinds, and were fastened on the inside with catches. The hinge on the lower part of the right blind was broken before that night. The catches were good. The alarm was given between ten and twelve o'clock. The prisoner walked off about dark with the same shoes that were found under the window. He was brought to the house of the prosecutor, as before stated, before sun-up. The prosecutor shot him with a double-barreled shot gun, and he ran off. The blinds to the windows were all closed at night, but he does not know whether *323 any one opened the shutters or not. They might or could have been opened, and the witness, Wynne, the prosecutor, not have known it. He found the neck-tie, hat and shoes, next morning; the hat and shoes on the outside, and the neck-tie and head-rag on the inside. It was a dark night. He could not see the negroes coming up after he called them. The prisoner never attempted to escape until after the prosecutor shot him. He had on boots and a slick cap, when brought to his house — was accustomed to wear shoes during the week. Prosecutor never saw him with boots on, except on Sunday.
Henderson Ross saw prisoner on the same night of the alleged burglary — early in the night. Prisoner went hunting, and came back to witness’s house, but cannot say what time it was. He left witness’s house after witness went to sleep.
Louis Ross was in the woods hunting with prisoner; but cannot state how long they staid in the woods, or how long prisoner staid at the house, (it is not shown what house,) after they came back.
John Ransom saw the prisoner at Smith’s, the night of the alleged house-breaking. Smith’s is a mile and a quarter from Wynne’s, and this was an hour-and-a-half in the night. Witness does not know what prisoner had on; but he had just come from hunting. Cannot say when prisoner left Smith’s.
John W. Wynne was examined, and stated he lived at Mr. Scott’s, a mile from Mr. Wynne’s. Prisoner came to house of witness about 8 or 9 o’clock. He stayed all night. Witness went to sleep and left pris *324 oner sitting in a chair. He had on a blue coat, cap, and boots. He stayed in witness’s house until he was carried away next morning. Witness’s wife came home about 11 o’clock, from a visit to a sick woman. The prisoner was then still sitting in the chair asleep. Prisoner was in the habit of coming to house of witness and staying all night. Witness is a cousin of the prisoner. There was but one room to witness’s house. Prisoner did not come to the house of witness until after the wife of witness left.
Lucinda Wynne, wife of the last witness, fully corroborates the statements of her husband. She went to Mr. Acock’s to see a sick woman, about dark; returned home about 10 or 11 o’clock; found prisoner then sitting in a chair asleep. He was not there when she left. She made a pallet down, and told prisoner he could lay down, which he did, and stayed there all night. Prisoner visited the house frequently. Prisoner was lying on the pallet next morning when Bell and Scott came and got him.
It will be seen that the prisoner, by the witnesses, John W. Wynne and his wife, proved an alibi. The State introduced one witness, William Runnals, as rebutting testimony, who said: “I know John W. Wynne. His general character is bad for truth and veracity. I don’t hardly think I could believe him on oath in a court of justice.”
This was all the proof in the cause, except proof showing that the alleged felony was committed, if committed at all, within the jurisdiction of the court, and before the finding of the indictment.
*325 If there were no other error in the judgment and proceedings in this cause, we think that it should be reversed; because the proof does not warrant a verdict of guilty. The prisoner undoubtedly shows an alibi, and the one witness brought to impeach one of the witnesses proving it, does not, according to the well settled course of examining witnesses, even in civil causes, destroy or ' impair the testimony which establishes the absence of the prisoner from the place where the burglary was alleged to have been committed, and his presence at another place at the very time when the proof for the 'prosecution shows that it was committed.
Besides, the indictment charges in a very inartificial and bungling manner, a burglary with an intent to commit a rape, and also it may he an attempt to commit a rape in the same count; and the tverdict of the jury, the last time,- was, that the defendant was guilty as charged in the indictment.
We have, however, deemed it unnecessary to notice any other points raised in argument, as the insufficiency of the proof to sustain the verdict is a ground for a reversal of the judgment and a new trial.